UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| SANDRA F. PURYEAR, | ) | |
| Plaintiff, | ) | Civil Action No. 4:14-cv-00057 |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By: Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Sandra Puryear asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. Puryear asserts that the Administrative Law Judge ("ALJ") erred in failing to consider a closed period of disability. This Court has authority to decide Puryear's case under 42 U.S.C. § 405(g), and her case is before me by referral under 28 U.S.C. § 636(b)(1)(B). After considering the administrative record, the parties' briefs, oral arguments, and the applicable law, I find that the Commissioner's decision is not supported by substantial evidence in the record. Therefore, I recommend that this Court reverse the Commissioner's final decision and remand the case for further administrative proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

1

asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a)(4); *see also Heckler v.*

2

*Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Puryear protectively filed for DIB and SSI on October 25, 2011, alleging disability beginning April 30, 2006. Administrative Record ("R.") 20, 188, 192. When she filed her applications, she was 44 years old. R. 188. She had worked as a machine attendant, machine operator, and cook and cashier at a grocery. R. 221. Puryear reported that she was unable to work because of arthritis, diabetes, and high blood pressure. R. 240. A state agency twice denied her application. R. 20.

Puryear appeared with counsel at an administrative hearing on September 4, 2013. R. 41–60. She testified as to her past employment, her symptoms, and the limiting effects of her conditions. R. 45–55. An impartial vocational expert, Barry Hensley, Ed.D., also testified at the hearing. R. 56–59.

In a written decision dated September 27, 2013, the ALJ concluded that Puryear was not disabled. R. 20–33. The ALJ determined that Puryear had not engaged in substantial gainful activity since April 30, 2006. R. 22. He found that Puryear had severe impairments of bilateral knee difficulty, diabetes mellitus, and obesity, none of which met or equaled a listing. R. 22–23. The ALJ determined that Puryear has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). R. 24. Although the ALJ found that Puryear was not able to perform any past relevant work, he determined that she could perform other work in the national economy. R. 31. Thus, the ALJ found that Puryear was not

disabled. R. 33. Puryear sought review by the Appeals Council, which upheld the ALJ's determination. R. 1–3. This appeal followed.

## III. Statement of Facts

A.   Medical Evidence

Puryear's medical history, as provided for the record, begins on January 8, 2010, when she was seen at Halifax Primary Care, by Arthur Fajardo, M.D. She appeared healthy, looked well, and her diabetes was under control. R. 359–60. Dr. Fajardo made similar findings on June 24, 2010. R. 356–57.

On September 9, 2010, Puryear went to Halifax Primary Care for pre-knee replacement operation clearance after laboratory tests showed that she had low potassium. R. 352. She told Venkat Neelagiri, M.D., that she had left sided knee joint pain from severe degenerative joint disease. R. 352–53.

On October 22, 2010, Puryear had X-rays taken of her lower extremities. The images of her left leg showed severe medial compartment osteoarthritic change with severe joint space narrowing, moderate osteophyte formation, and mild lateral subluxation of the proximal tibia relative to the distal femur. Moderate osteophytic changes were also present in the patellofemoral compartment of the left knee. The images showed no sign of significant joint effusion or other acute process. R. 401.

On November 9, 2010, Puryear was examined by Dr. Neelagiri. Puryear said that an orthopedist, on second opinion, had advised that she did not need knee replacement surgery because her degenerative joint disease was not severe enough. She complained of back stiffness and pain and left knee pain. Dr. Neelagiri's physical examination showed normal range of motion and no joint tenderness in her hips, knees, or ankles. Her gait was normal. She had no

4

joint laxity, muscle weakness in her extremities, or decreased muscle tone. Her knee reflex was normal. R. 346–50.

On January 7, 2011, Puryear had a follow up examination with Dr. Neelagiri. She reported experiencing occasional left low back pain that did not radiate. On examination, Dr. Neelagiri found no lumbar paraspinal spasm or tenderness. Her straight leg raise testing was negative bilaterally, deep tendon reflexes were 2+ bilaterally and equal, strength was full in all four extremities, and knee reflex was normal. Puryear's diabetes and hypertension remained controlled. R. 341–43. Dr. Neelagiri made similar findings in April 2011. *See* R. 334–38.

On April 8, 2011, Puryear was seen at VCU Health System/MCV Hospitals & Physicians, by Jason Hull, M.D., for left medial compartment knee arthritis. Dr. Hull noted that prior X-rays had shown significant narrowing of the medial compartment, especially on the PA flexion view. Puryear had received an injection in October 2010, which she said provided approximately five months of good relief, but she experienced rapid return of symptoms with medial knee pain. Physical examination revealed an antalgic gait on the left side. Puryear had pain-free motion of the left hip and was mildly tender over the left trochanteric bursa. She had varus posture to the left knee with partial correct and medial compartment tenderness. Dr. Hull gave her another cortisone injection. R. 368–69; 396–97.

On September 2, 2011, Puryear had imaging taken of her lower extremities. Kevin Hoover, M.D., reviewed the images, compared them to images taken in 2010, and assessed progressive knee osteoarthritis, which was severe in the medial compartment. R. 400.

On October 12, 2011, Puryear visited Dr. Neelagiri for a six-month follow-up. On exam, Dr. Neelagiri found no lumbar paraspinal spasm or tenderness, negative bilateral straight leg raise testing, normal deep tendon reflexes, and full strength in all four extremities. Puryear had

5

mild tenderness in her knee joints and bilateral crepitus, but normal reflexes and no effusion. R. 319–20, 322–24; 505–09.

On November 23, 2011, Puryear went to Dr. Neelagiri for a disability evaluation. Puryear reported that she stopped working six years earlier because of knee pain. She also reported experiencing headaches. On examination, Dr. Neelagiri found that Puryear had normal gate, knee joint tenderness on the left, but not on the right, and crepitus bilaterally. Knee range of motion and lower extremity strength were normal. Dr. Neelagiri recommended regular physical activity for preventative care. R. 299–303; 315–18, 321; 500–04.

On January 13, 2012, Puryear returned to Dr. Hull at MCV. She reported experiencing no pain relief from the injection she received in early September 2011 or the Piroxicam she was taking. Dr. Hull noted that Puryear ambulated with antalgia on the left side. On exam, he found a trace amount of tochanteric tenderness in Puryear's left hip, but no pain laterally with resisted side-lying abduction. Her left knee was in neutral alignment. Dr. Hull noted no warmth or effusion, significant medial joint line tenderness, no parapatellar tenderness or anterior pain with eccentric quad contraction, and no instability. Prior X-rays showed maintenance of neutral alignment and well-preserved joint space on standing AP view, but she had almost complete loss of medial joint space in the left knee with the PA flexion view. Small osteophytes were also present. Dr. Hull assessed isolated medial compartment osteoarthritis of the left knee. He discussed conservative measures versus surgery, and Puryear elected to pursue conservative measures. Dr. Hull opined that when Puryear was ready to consider knee replacement, she was a good candidate for a medial unicompartmental arthroplasty. R. 394–95; 406–07.

On March 1, 2012, Puryear had a four-month follow-up with Dr. Neelagiri. She reported having left-sided knee pain that did not improve when Dr. Hull injected her knee in September

6

2011. Tramadol also did not ease the pain much, and stronger analgesics were not an option because they exacerbated her gastro-esophageal reflux disease. She also reported experiencing occasional left hip pain. Dr. Neelagiri noted that Puryear appeared well upon physical examination and had full strength in all four extremities. She had tenderness in the left knee and hip joints on range of motion, but no effusion. Crepitus was present in her left knee joint, but her knee reflex was normal. Dr. Neelagiri advised Puryear to be compliant with current medications and diet, lose weight, and exercise regularly. R. 294–98; 494–98.

On April 12, 2012, Puryear saw Gurpal Bhuller, M.D., at Community Memorial Health Center for evaluation of pain and swelling in her left knee. She reported localized left knee pain and nighttime swelling, but denied radicular pain, locking, catching, weakness, or instability. She had tenderness to palpation medially in her right lower extremity, but no swelling. She stood with some varus on the left knee. She had active flexion and extension, full and painless, with no crepitus. There was no valgus or varus instability present on provocative testing. Strength on flexion and extension were full, and stability was normal. Examination of her lower left extremity, hip, thigh, knee, lower leg, ankle, and foot revealed no tenderness, swelling, deformities, instability, sublaxations, weakness, or atrophy. Range of motion in all planes was full and painless. Gait was normal. Images of Puryear's left and right knees revealed compartment narrowing on the medial side of the left knee, but no fractures. Dr. Bhuller prescribed Vicodin for pain. R. 428–29; 574–76. On June 26, 2012, Dr. Bhuller examined Puryear and reported similar findings. To address her pain, he recommended a cortisone injection, which he then administered. R. 431–42; 577–78.

On August 2, 2012, Dr. Neelagiri saw Puryear for a five-month follow-up and annual physical. She reported left knee pain for which the injection administered in June 2012 provided

7

no relief. Tramadol also did not ease her pain much. She had a normal gait, and her strength was full in all four extremities. She had tenderness in the left knee on range of motion and some crepitus, but Dr. Neelagiri's other findings were normal. R. 488–91.

On August 29, 2012, Puryear had a follow-up evaluation of her left knee pain with Jibanananda Satpathy, M.D.. Puryear reported having ten out of ten pain, which was worse with activity. On examination of Puryear's left knee, Dr. Satpathy assessed mild swelling and varus deformity, tricompartmental joint line tenderness, and range of motion of 0–130 degrees, with discomfort. No valgus or varus instability was present on provocative testing, and flexion and extension were full. Dr. Satpathy discussed options of continuing with conservative treatment or having a partial or full knee replacement. Puryear elected to have the full knee replacement because she said conservative treatment had not controlled her pain. R. 433–34; 579–80.

On September 24, 2012, Puryear underwent left total knee replacement. Dr. Satpathy performed the surgery, which he determined had no complications. He found that Puryear had end-stage osteoarthritis. Imaging taken after the surgery revealed status-post total prosthetic replacement of the left knee joint, with anatomic positions, and anatomic alignments of all prostheses. R. 436; 566–68; 570; 583.

On October 4, 2012, Puryear returned to Dr. Satpathy for a postoperative visit. Examination of her left knee showed a healing wound, with no drainage. She had 5–90 degrees range of motion, no instability, and no neurological deficit. She also had a CT scan of her head for headaches. The result of the CT was normal. R. 439–40; 565; 584–85.

Dr. Satpathy examined Puryear again on November 1, 2012. He noted a healed incision and no joint tenderness, effusion, or instability. Range of motion had increased. X-rays of Puryear's knee showed good positioning and no signs of complications. Dr. Satpathy

recommended that Puryear gradually discontinue using a cane and gradually increase her physical activity. R. 446–47; 589–90.

On November 2, 2012, Puryear followed up with Dr. Neelagiri. Puryear reported doing well with physical therapy. She experienced knee pain after therapy and during cold temperatures, but the pain was better than before the surgery. She was taking Oxycodone for knee pain as needed. R. 480–82.

On December 19, 2012, Puryear was seen by Dr. Satpathy. She reported participating in physical therapy and taking pain medications. Physical examination revealed no swelling in her left knee, no joint line tenderness, 5–105 degrees range of motion, and no instability. She was neurovascularly intact. Puryear reported experiencing some pain at night, and Dr. Satpathy recommended that she take one Lortab at night and Motrin during the day. R. 452–53; 592–93.

At a follow-up with Dr. Neelagiri on January 8, 2013, Puryear reported that she was walking, doing well in physical therapy, and taking Vicodin and Motrin only as needed for pain, which she experienced only after physical therapy and in cold temperatures. R. 470–74; 553–56.

On January 31, 2013, Puryear had a follow-up evaluation with Dr. Satpathy. She reported doing very well and denied any knee pain. Dr. Satpathy's examination revealed the same findings as in December 2012. Puryear's chief complaint was right shoulder pain. R. 454–55; 594–95.

Subsequent medical records in the Administrative Record primarily concern Puryear's right shoulder, right knee, and diabetes. Puryear's arguments in this appeal do not concern these medical conditions.

B.  Medical Opinions

On November 23, 2011, Dr. Neelagiri completed an assessment of Puryear's functional abilities. He noted that he began treating Puryear on September 9, 2010, and had last seen her on the date of the assessment. Dr. Neelagiri reported that Puryear suffered from left knee degenerative joint disease, which caused consistent, severe pain. Her symptoms were severe enough to interfere constantly with her ability to pay attention and to concentrate. Dr. Neelagiri opined that Puryear's symptoms would not interfere with her ability to perform activities of daily living, and she would be absent from work four times a month because of her symptoms. At different points in the assessment, Dr. Neelagiri opined that Puryear could work only four hours a day, four times a week, but he also found that she could sit for four hours and stand or walk for two hours in an eight-hour workday. She could sit continuously for two hours and stand continuously for one hour, but she would need to able to change positions every hour. She would need to elevate her leg for one-quarter of an eight hour workday, and she would need to take two unscheduled breaks for ten to fifteen minutes each. Puryear could occasionally lift up to twenty pounds, frequently lift up to ten pounds, and never stoop, climb, kneel, crouch, crawl, or walk up an incline. R. 379–85.

On February 2, 2012, state agency physician David C. Williams, M.D., reviewed Puryear's medical records. He determined that Puryear could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand or walk for four hours and sit for six hours in an eight-hour workday. Dr. Williams opined that Puryear would be able to resume light work after a period of treatment. R. 63–69. One month later on reconsideration, state agency physician Wyatt S. Beazley, III, M.D., found greater restrictions. He noted that as of November 2011 the cartilage was gone and the arthritis had worsened in Puryear's left knee. He determined

10

that she was limited to frequently and occasionally lifting and carrying ten pounds. She could stand or walk for two hours and sit for six hours in an eight hour workday. Dr. Beazley opined that Puryear's knee condition would likely improve with surgery. R. 81–88.

C.   Puryear's Statements

On November 24, 2011, Puryear described her condition in a pain questionnaire. She reported that pain had limited her activities for six years. She needs no assistance with personal care. As to her daily activities, Puryear gets her daughter ready for school and helps her with homework, prepares meals, watches television, listens to music, reads, prepares Sunday school lessons, and walks to the mailbox. In terms of house work, Puryear is able to wash dishes, do laundry, clean, and iron as needed. She shops for groceries, clothes, and personal items once a week for an hour or two.  She goes to church once a week to teach Sunday school classes and attend missionary meetings and choir practice.  She estimated that she can lift thirty pounds, walk one quarter of a mile, and stand for thirty minutes. She uses a cane when her knee pain is severe. R. 229–36.

Puryear testified during her hearing before the ALJ on September 4, 2013.  R. 45.  She stated that she had undergone a left knee replacement on September 24, 2012. R. 47. After the surgery she tore a ligament in her right knee, which caused pain. R. 47–48. She began treatment with Dr. Hull in 2010. R. 51. He administered cortisone shots, which initially relieved her pain for one month. R. 51–52, 55.  She could walk and stand for ten to fifteen minutes at a time and sit for twenty minutes with constant movement; she can lift ten pounds.  R. 48–49. She has difficulty bending and is able to squat only a little. R. 48. She has had these limitations since 2010. R. 53–54. Puryear is able to sleep only four hours a night, and her insomnia and medications make her drowsy. R. 49. She uses a cane. R. 55. She makes light meals, helps her

11

eleven-year-old daughter with homework, and goes to church twice a month and the grocery store, if her pain is not too extreme. R. 50.

IV. Discussion

On appeal, Puryear primarily argues that the ALJ failed to analyze whether the record established a closed period of disability of more than twelve months. Puryear Br. 3–15, ECF No. 20. Puryear also argues that the ALJ failed to provide reasons why he discredited her testimony and the opinion of her treating physician and that the ALJ improperly assessed her RFC.

A.  Closed Disability Period

Puryear argues that the ALJ failed to consider whether she was entitled to a closed period of disability. She asserts that the evidence presented by her treating physician, coupled with the underlying medical record, establish at least a twelve-month period of disability beginning with the date of her diagnoses in November 2010 and ending a few months after her knee replacement surgery in September 2012.[1]

To qualify for disability benefits, a claimant need not show that he or she is permanently or even currently disabled at the time of the hearing. *See Miller v. Comm'r of Soc. Sec.*, No. 13 Civ. 6233, 2015 WL 337488, at *24 (S.D.N.Y. Jan. 26, 2015). The ALJ must evaluate whether a claimant has shown that he or she was disabled for any consecutive twelve-month period between his or her onset date and the date of the hearing. *See id.* "The disability inquiry must be made throughout the continuum that begins with the claimed onset date and ends with the hearing date, much as though the ALJ were evaluating a motion picture at every frame of the hearing." *Calhoun v. Colvin*, 959 F. Supp. 2d 1069, 1075 (N.D. Ill. 2013). Failure to consider

---

[1] Although Puryear initially claimed a period of disability beginning on April 30, 2006, her counsel clarified during oral argument that she seeks this closed period of disability. *See also* Pl. Br. 4–5.

whether a closed period of disability exists may warrant remand. *See, e.g.*, *Reynoso v. Astrue*, No. CV 10-04604, 2011 WL 2554210, at *5-7 (C.D. Cal. June 27, 2011) (remanding for the ALJ's failure to consider whether claimant had a closed period of disability prior to undergoing surgery); *Dounley v. Comm'r of Soc. Sec. Admin.*, No. 3:08cv1388, 2009 WL 2208021, at *8–9 (N.D. Tex. July 22, 2009) (remanding with instructions to consider claimant's entitlement to a closed period where the ALJ relied on medical evidence generated after the surgery that permitted the claimant to work).

Puryear does not claim, at least presently, that she was disabled in September 2013 when the ALJ issued his opinion or in 2006 when she says her symptoms began. She does assert, however, that she was disabled for more than twelve months leading up to her surgery in September 2012 and during her recovery period. The record establishes, and the ALJ seems to acknowledge, that Puryear's knee impairment, symptoms, and limitations differed before and after her surgery. Indeed, the ALJ's analysis of Dr. Neelagiri's opinion and Puryear's RFC relies heavily upon the ALJ's determination that the record shows improvement of her left knee impairment following surgery. *See* R. 30–31. In his RFC analysis and findings, the ALJ did not address whether the RFC reflected Puryear's maximum functional ability from before or after her surgery. He simply does not discuss whether Puryear's RFC changed or whether she satisfied the disability criteria for any period before her surgery. It is minimally necessary for the ALJ to consider and discuss his findings in relation to Puryear's alleged disability both prior to and after the surgery. Unless the record contains no evidence indicating that Puryear could meet the criteria for a closed period of disability, remand is necessary to allow the Commissioner to weigh the evidence on that issue. As discussed below, the ALJ's analyses of the medical opinions and

RFC do not expressly account for evidence indicating greater impairment before Puryear's surgery. Such an omission warrants remand.

B.    Treating Physician

The ALJ assigned little weight to the medical opinion of Puryear's treating physician, Dr. Neelagiri. Puryear argues that the ALJ's reasons for discounting Dr. Neelagiri's opinion do not address that opinion's applicability to her pre-surgery limitations.

Agency regulations instruct ALJs to weigh each medical opinion in the applicant's record. 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions from treating physicians receive either "controlling weight" or less than controlling weight. *Id.* §§ 404.1527(c), 416.927(c). A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the applicant's] case record." *Id.*; *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). He also must consider certain factors in determining what weight to give that opinion, such as the length and nature of the doctor-patient relationship, the weight of the evidence supporting the opinion, the physician's medical specialty, and the opinion's consistency with other evidence in the record. *See id.*; *Clausen v. Astrue*, No. 5:13cv23, 2014 WL 901208, at *9 (W.D. Va. Mar. 7, 2014). That obligation is satisfied when the ALJ's decision indicates that he considered the required factors. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Vaughn v. Astrue*, No. 4:11cv29, 2012 WL 1267996, at *5 (W.D. Va. Apr. 13, 2012), *adopted by* 2012 WL 1569564 (May 3, 2012) (Kiser, J.).

14

The ALJ granted Dr. Neelagiri's opinion less than controlling weight because he found it was inconsistent with other evidence in the record. R. 30–31. As the primary reason for giving the opinion little weight, the ALJ noted that Dr. Neelagiri last saw Puryear on November 23, 2011, and the limitations identified in his opinion did not reflect any of the subsequent medical records showing that Puryear's condition improved. The ALJ cited Puryear's total knee replacement in September 2012 and resulting normal gait as evidence of this improvement. This reason is valid, and Puryear does not contest it, in determining her functional capabilities post-surgery. It does not, however, refute Dr. Neelagiri's opinion for the period from November 2010 to her surgery, nor does it address Puryear's RFC during that period. Moreover, the ALJ did not cite any medical findings from that period as contradicting Dr. Neelagiri's opinion.

The only other reason provided by the ALJ is that Dr. Neelagiri's conclusion that Puryear's symptoms would not interfere with her activities of daily living is inconsistent with the limitations he identified elsewhere in his opinion. R. 31. This is a valid observation, but this single inconsistency is not by itself an adequate basis to discard a treating physician's opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

To properly address whether Puryear was disabled for a closed period, the ALJ needed to determine whether Dr. Neelagiri's opinion deserved weight for the period before Puryear's surgery, not just for the period after her surgery. Accordingly, I find that the ALJ's assessment of the treating physician's opinion is not supported by substantial evidence.

C.  Puryear's RFC

Puryear challenges the ALJ's RFC determination as it relates to a closed period of disability. A claimant's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). "It is an administrative assessment made by

15

the Commissioner based on all the relevant evidence in the [claimant's] record," including objective medical evidence, medical-source opinions, and the claimant's own statements. *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam); *accord* SSR 96-8p, 1996 WL 374184 (July 2, 1996). The RFC must reflect the combined limiting effects of impairments "supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints." *Carter v. Astrue*, No. 3:10cv510, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011), *adopted by* 2011 WL 2693392 (July 11, 2011); *accord* 20 C.F.R. §§ 404.1545(e), 416.945(e). "The 'RFC is an assessment of the individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Morgan v. Barnhart*, 142 F. App'x 716, 720 (4th Cir. 2005) (unpublished) (quoting Social Security Ruling 96-8p).

> The ALJ determined that Puryear's RFC would allow her to
>
> perform sedentary work …, insofar as she is able to lift/carry 10 pounds occasionally and less than 10 pounds frequently, stand/walk about two hours, and sit about six hours during an eight-hour workday. She cannot climb ladders/ropes/scaffolds, kneel, or crawl but she can perform other postural activities occasionally (such as balancing and stooping). Last, she should avoid even moderate exposure to hazards (such as heights and moving machinery).

R. 24. Puryear claims that the ALJ improperly assessed her RFC as it is not clear to which period of time the RFC applies. The Commissioner argues that it is reasonable to infer that the RFC applies to the entire period of review. The grounds to support this inference are not apparent from the record.

As discussed above, the ALJ did not consider whether Dr. Neelagiri's opinion of Puryear's functional capabilities deserved any weight for the period before Puryear's surgery. Similarly, when assessing the credibility of Puryear's complaints, the ALJ focused on the medical records following her total left knee replacement and found limited clinical

16

abnormalities. *See* R. 30. The ALJ also discussed Puryear's alleged onset in 2006 and questioned the severity of her limitations at that time. *Id.* The ALJ's doubts about the credibility of her complaints during those periods are reasonable, and Puryear has retracted her claim of an earlier onset. The ALJ's analysis, however, did not address the credibility of her complaints for the roughly two years preceding her surgery.

Consistent with the treating physician and credibility assessments, the ALJ's RFC analysis focuses on Puryear's improved condition as of September 2011. Certainly, the ALJ discussed the vast majority of the evidence in the record, but his analysis and explanation for his RFC findings focused almost entirely on Puryear's improved knee condition. As it goes, this analysis is supported by the record, and the ALJ's RFC determination for the period following her surgery is proper. Implicit in the ALJ's finding that Puryear's knee impairment improved after surgery to the extent that she could perform sedentary work, however, is a finding that her condition was worse before surgery. This finding of improvement shows a changing functional capability, and it undermines the Commissioner's argument that the ALJ determined that a single RFC was representative of Puryear's functional capabilities for the entire period. If Puryear's knee impairment and the limitations it imposed persisted for more than twelve months prior to her surgery and reasonable recovery period, the ALJ should have assessed her RFC for that period and then determined whether Puryear could perform any work at that time. Thus, the crucial omission from the ALJ's analysis is what was Puryear's RFC before surgery and how long did it last. Without this analysis, I cannot find that substantial evidence supports the ALJ's RFC determination.

The objective evidence in the record, including imaging that showed severe degenerative changes, and Dr. Neelagiri's opinion could provide a basis for the ALJ to find a closed period of

17

disability. On the other hand, normal findings on physical examinations and Puryear's activities of daily living may provide enough evidence for a contrary finding. These decisions are the province of the Commissioner, not the Court. On remand the ALJ must consider all such evidence in assessing Puryear's RFC for the continuum of her claims, including a closed period of disability.

## V. Conclusion

For the reasons discussed above, I find that the Commissioner's final decision is not supported by substantial evidence in the record. I further find that remand is necessary so that the Commissioner may consider Puryear's claim for a closed period of disability. Therefore, I **RECOMMEND** that the presiding District Judge **DENY** the Commissioner's motion for summary judgment, ECF No. 25, **REVERSE** the Commissioner's final decision, and **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g).

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

Entered: January 5, 2016

Joel C. Hoppe
United States Magistrate Judge